# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF MASSACHUSETTS

# EASTERN DIVISION

| | |
|---|---|
| In re<br><br>CHINMAY CHATTERJEE and<br>NILU P. CHATTERJEE,<br><br>                    Debtors | **Chapter 7**<br>**Case No. 16-10220-FJB** |
| IINTEGRATED PHARMACEUTICALS,<br>INC.,<br><br>                    Plaintiff<br><br>v.<br><br>CHINMAY CHATTERJEE and<br>NILU P. CHATTERJEE,<br><br>                    Defendants | **Adversary Proceeding**<br>**No. 16-1033** |

## MEMORANDUM OF DECISION

By its complaint in the above-captioned adversary proceedings, plaintiff Integrated

Pharmaceuticals, Inc. ("Integrated"), of which the defendant debtors, Chinmay Chatterjee ("Chinmay")

and Nilu Chatterjee ("Nilu") (together, "the Chatterjees" or "the Debtors"), were formerly officers and

directors, seeks a determination that a state-court judgment it has obtained against the Chatterjees for

breach of their fiduciary duty to Integrated is excepted from discharge.  After a trial on largely agreed

facts, I now enter the following findings of fact and conclusions of law.

## PROCEDURAL HISTORY

In 2010, Integrated filed suit against the Chatterjees in the Superior Court Department of the

Trial Court of the Commonwealth of Massachusetts for, among other things, breaches of their fiduciary

duties to Integrated. The Superior Court entered judgment for Integrated, whereupon the Chatterjees

appealed. On May 18, 2015, the Massachusetts Appeals Court remanded to the Superior Court for

further findings.  On June 25, 2015, the Superior Court entered revised findings of fact, rulings of law,

and a direction for entry of judgment.  Judgment entered accordingly on July 3, 2015 ("the Judgment").

The Judgment awarded to Integrated $266,215.00 against Chinmay and a further $273,615 against Nilu,

plus interest and costs against both.  Against each of the Chatterjees, the damage award had two

components:  forfeiture of salary earned while serving Integrated with compromised loyalty, $166,215

against Chinmay and $173,615 against Nilu; and a further $100,000 against each for their respective

responsibility for a $200,000 transfer from Integrated to a competitor for whom they were secretly

working.  The matter returned to the Appeals Court, which, on September 8, 2015, affirmed the

Judgment.  The Chatterjees applied for further appellate review in the Supreme Judicial Court, but on

October 30, 2015, their application was denied.

On January 25, 2016, the Chatterjees filed a joint petition for relief under Chapter 7 of the

Bankruptcy Code, thereby commencing the bankruptcy case in which this adversary proceeding arises.

In the bankruptcy case, the Debtors have received a discharge under 11 U.S.C. § 727.  Now, by its timely-

filed complaint in this adversary proceeding, Integrated seeks a determination that its Judgment is

excepted from discharge as to each debtor.  The complaint states six counts, three each against Chinmay

and Nilu, with separate counts against each debtor under each of subsections (a)(2), (a)(4), and (a)(6) of

11 U.S.C. § 523.  The counts under (a)(4) allege fraud or defalcation while acting in a fiduciary capacity

(but not larceny or embezzlement); they do not plead with particularity the fraud that is the basis of this

count.  Neither do the counts under subsection (a)(2) plead with particularity the circumstances

constituting the false pretenses, false representation, or actual fraud that is their basis.

The adversary proceeding initially came before the Court on a motion by Integrated for

summary judgment, through which Integrated sought judgment by the issue-preclusive effect of the

Judgment.  The Court denied summary judgment but, pursuant to Fed. R. Civ. P. 56(g), made applicable

by Fed. R. Bankr. P. 56, nonetheless determined that the Judgment preclusively established certain facts, and a ruling of law that flow from them, all bearing upon the counts under subsection (a)(4).

The Court then scheduled the complaint for trial.  At the trial, the parties submitted the matter on stipulated facts, the agreed facts being those that the Superior Court entered as its revised findings of fact, plus such further findings as the Superior Court set forth in the same document among its rulings of law.[1]  In addition, the parties, by agreement, submitted into evidence the exhibits from the Superior Court trial (thirty-six in all), the Superior Court's Revised Findings of Fact upon Remand, the Judgment, the opinion of the Massachusetts Appeals Court of September 8, 2015, the Supreme Judicial Court's docket concerning the Chatterjees' application for further appellate review; executions that the Superior Court issued against each of the Chatterjees on December 4, 2015, and the transcript of the Superior Court trial ("the Transcript").  Though the entirety of the trial transcript was submitted, the parties indicated that the Court should consider only those portions cited by Integrated in its proposed findings. The Chatterjees were afforded an opportunity to cite further portions that they wished the Court to consider, but they declined to cite anything further. The parties presented no witnesses and submitted no other evidence.

**FINDINGS OF FACT**

The stipulated facts are as follows, in paragraphs 1 through 60.  As they are stipulated facts and not my findings, I replicate them essentially verbatim.

1.      Chinmay and Nilu, along with their business partner Edward Furtado ("Furtado"), founded Advanced Process Technologies in or around March 1998.

2.      Chinmay, Nilu, and Furtado also formed Integrated Pharmaceuticals, Inc. ("Integrated") in or around 2000, and Integrated acquired Advanced Process Technologies in 2000.

---

[1] In their Joint Pretrial Memorandum, the parties jointly stated:  "The Parties stipulate to the facts found by the Trial Court in the Revised Findings of Fact and Rulings of Law on Remand."

3.      Integrated is a corporation organized under the laws of the State of Idaho, with a

Massachusetts office located at 310 Authority Drive, Fitchburg, Worcester County, MA 01420.

Integrated was a publicly traded company that was in the business of developing, manufacturing,

marketing and distributing dietary supplements and nutritional substances.

4.      Chinmay was the President and CEO of Integrated until he gave notice of his departure

on July 19, 2007.

5.      Nilu was the Vice President of Research and Development of Integrated until Integrated

ceased operations on August 31, 2008.

6.      The Chatterjees were both employees, directors, and investors of Integrated.

7.      David Smith ("Smith") joined Integrated's board of directors ("the Board") in February

2004, after he personally invested $1,250,000 in Integrated. Smith later increased his investment to a

total of $2,400,000. Smith had met with Chinmay just once prior to his initial investment.  He chose to

invest in Integrated based largely on his belief that Chinmay had the intelligence and drive to lead

Integrated to success.

8.      Sally Johnson-Chin ("Johnson-Chin") joined the Board in 2002 and invested $275,000 of

her personal funds in Integrated.

9.      Integrated raised approximately $6 million in investments by the end of 2004 and $9.7

million in investments over its lifespan.

10.     The Chatterjees developed and intended to market a highly purified, water-soluble

calcium powder (a calcium gluconate) to nutritionally fortify food and beverage products.

11.      By early 2005, the Board had planned to sell the calcium powder in packets that could

be added to food and beverage products without altering the taste.

12.     Chinmay, Nilu, and Furtado held various patent rights related to the process of refining

calcium gluconates and other gluconates in an entity called the NEC Partnership, including a patent for

the water-soluble calcium powder.  These patent rights were licensed to Integrated under a license

Agreement (the "License Agreement").  The License Agreement defines two kinds of intellectual

property subject to the license:  "Licensor [NEC] hereby grants to Licensee [Integrated], subject to all the

terms and conditions of this License Agreement, a right and license to make, have made, use, lease,

promote, market, distribute, and sell the Licensed Products and Licensed Processes in the Field

throughout the Territory.  The right and license granted hereunder shall be exclusive as to any Patent

Rights, and non-exclusive as to any Technical Information."

13.    The NEC Partnership expressly retained the right to use any of the "Technical

Information" relating to the patent process.  It also required Integrated to pay a 3% royalty or $25,000

per quarter to NEC, whichever was greater. The quarterly minimum was only in effect if Integrated's

sales were $5 million or greater.

14.    By early 2005, the Board had planned to sell the calcium powder in packets that could

be added to food and beverage products without altering the taste.

15.    Chinmay proposed to the Board that Naples Marketing Systems, Inc. ("Naples") be

Integrated's distributor and marketing agent, identifying Naples' contact with Demoulas Market Basket

and indicating that Naples had come up with a name for the calcium powder ("Cal-Sap").[2] [sic][3]

16.    Unbeknownst to the Board, Naples had already applied for the registered trademark for

Cal-Sap in February 2005, before Chinmay had even introduced or suggested Naples to the Board.

17.    Naples was founded as a Massachusetts limited liability company on July 13, 2004.

Naples was created by Chinmay and one Constantine Miserlis ("Miserlis") to sell the same highly

---

[2] The stipulated facts do not indicate when Chinmay made this proposal to the Board. I surmise from other stipulated facts that he made this proposal sometime after February 2005.

[3] The grammatical trouble in this stipulated fact—which the parties apparently did not see fit to edit or correct—makes the meaning of the latter part of the sentence (from and after "identifying") unclear.  I understand the latter part of the sentence to mean that, in support of the proposal to the Board that is the subject of this sentence, Chinmay indicated to the Board that Naples had contact with Demoulas Market Basket and had come up with the name Cap-Sap for the calcium powder.

purified, water-soluble calcium powder that the Chatterjees had created and that Integrated was

producing and poised to begin selling.

18.    Naples was owned "at the time" by Miserlis.[4]  Miserlis had no previous marketing

experience.  Miserlis was an Integrated investor and also a long-time friend and colleague of Chinmay.

Chinmay met Miserlis in 1992 while they both worked at Badger Engineers.  Miserlis is a retired engineer

and, by 2004, was in his mid-seventies.

19.    Miserlis was also a paid consultant of Integrated, where he worked on such projects as

improving Integrated's cooling tower design and bringing Integrated's wastewater treatment plant into

compliance with city regulations.

20.    Naples purchased the calcium powder from Integrated and packaged and distributed it

as a supplement to be added to water or other drinks in the retail market.  This was the exact same plan

and delivery method that Integrated planned to use.

21.    Smith had a private meeting with Chinmay about Naples in which he asked about

Naples' experience marketing and selling products.[5]  Chinmay responded that Naples was a new

company that had no other customers besides Integrated, but that it had a business connection to the

supermarket chain Market Basket. Smith also asked Chinmay directly who the principal of Naples was,

and Chinmay responded that he did not know.

22.    Johnson-Chin discovered that invoices from Integrated to Naples were being sent to

Miserlis at his home in Arlington, Massachusetts.

23.    The Board held an emergency meeting on September 5, 2005, in order to confront

Chinmay about the apparent conflict of interest with Naples and Miserlis.  Chinmay apologized to the

Board for not disclosing from the outset that Miserlis was running Naples.

---

[4] The stipulated facts say "at the time," but the time to which this phrase refers is unclear.
[5] The stipulated facts do not indicate when this meeting occurred.

24.     Smith also questioned why Integrated had made a recent payment of approximately

$200,000 to Naples for marketing services, and the $5,000 per month that was being paid to Miserlis for

consulting.  Chinmay said that he had transferred money from Integrated to Naples to help get them

started.

25.     Naples was the only company that Integrated ever paid to market and distribute Cal-

Sap.  Naples purchased from Integrated approximately $100,000 in calcium powder and other unrelated

bulk products.  Naples has never paid Integrated for an order of the calcium powder that is

memorialized in an invoice sent on July 10, 2007.

26.     Members of the Board expressed serious concerns to Chinmay about Naples' ability to

market the calcium powder in light of the fact that it was a new company, and was being run by a

seventy-five year old retired engineer.  The Board was also displeased with the name of the product,

and the packaging.  None of the packaging had Integrated's name on it, and as such, did not develop a

brand identification for the company.  Chinmay insisted that Naples was the right company to market

the calcium powder.

27.     The members of the Board believed that the calcium powder and brand name Cal-Sap

were Integrated's products.  They succumbed to Chinmay's insistence that Integrated work with Naples.

28.     Smith had a private conversation with Chinmay during which Smith recommended

retaining the marketing company Kelton Research to assist with creating a brand and marketing strategy

for the calcium powder. Chinmay responded that he did not want to hire Kelton Research, and wanted

to continue to market through Naples.

29.     Integrated's SEC year-end report for 2006 advertised a relationship with Naples:

> We have developed a patent-pending calcium supplement that can
> be sold in packets like those use for artificial sweeteners . . . . We
> have signed a License Agreement with Naples Marketing Systems,
> LLC for the distribution of this product.  Naples is selling the packets
> under the brand name "CAL-SAP", and currently supplies the product
> to a chain of about 59 grocery stores in New England, and is in

7

discussion with other substantial distribution channels.  The product
is also available at Naples's website www.calsap.com.

30.       In early 2006, Chinmay informed the Board that he and Miserlis were to meet with

Market Basket. The purpose of the meeting was to persuade Market Basket to carry the product Cal-

Sap.  Smith informed Chinmay that he would like to attend the Market Basket meeting, but Chinmay

insisted that Smith not attend—stating that this was the preference of the Market Basket

representative.

31.       The Board members believed that Chinmay was attending the Market Basket meeting as

a representative of Integrated and had no reason to doubt this basic assumption. Chinmay reported to

the Board that the meeting with Market Basket was a success and that the retailer had agreed to carry

Cal-Sap in some of its stores. However, when Market Basket sent an invoice to Chinmay, it was

addressed to him at Naples Marketing Systems, LLC. Cal-Sap did not sell particularly well in Market

Basket, and a second order for the product was never placed.

32.       In 2006, Johnson-Chin and Chinmay attended a meeting in New Jersey with a large

distributor named Golick Martins, Inc., which had the ability to place Cal-Sap in numerous retail stores.

At this meeting, Chinmay introduced himself as the CEO of Integrated, and the name Naples was never

mentioned. Golick Martins expressed a high level of interest in carrying Cal-Sap; however, Mr.

Chatterjee did not submit the documentation that Golick Martins requested. Also, Nilu failed to recertify

the substance, and the deal consequently fell through.

33.       As a product for Integrated to sell, Cal-Sap ultimately failed.

34.       Integrated spent $211,680 in marketing in the year 2005, essentially all paid to Naples.

In addition, Integrated spent $556,600 in the year 2005 on consulting fees, which was twice as much as

the amount spent on research and development and quality assurance ($276,341). It was also in the

year 2005 that Integrated was paying Miserlis over $5,000 per month for consulting work.

35.     Integrated failed to recertify its stock of calcium powder (a requirement for selling the substance). Nilu was responsible for recertification of inventory but never accomplished this task.

36.     In 2006, the Board decided to begin working on a bottled water project. Integrated's intention was to sell the exact same calcium powder, along with a few other ingredients, in a pre-packaged bottle of water. They created the brand-name HealthyCal+ for the new bottled water product.

37.     Integrated retained Kelton Research to assess the potential of the bottled water product. The results of the research were extremely positive and suggested that the product could be a huge success.

38.     Integrated was never able to manufacture a final bottled water product that was ready to be sold in stores. The development of the product was delayed significantly due to several factors: contamination of samples that went out for testing, the failure to recertify the ingredient, and a lack of movement, loyalty, and efforts on the part of the Chatterjees to get the project to the marketplace.

39.     Board members had wanted to terminate Chinmay in 2005, but the Board decided that it needed him to remain at Integrated for his technical knowledge and in order to continue producing the calcium product.

40.     Integrated was unable to generate revenue from the calcium powder, either through sales of Cal-Sap or HealthyCal+, and eventually ran out of money.

41.     The technical knowledge licensed to Integrated on a non-exclusive basis is the property of the Chatterjees and their business partner, not Integrated, and therefore cannot constitute a trade secret of Integrated. Further, once NEC gained patent protection for the substance and process, it ceased to be a trade secret if it ever was one.

42.     Board members Johnson-Chin and Smith asked Chinmay and Nilu for access to the proprietary information used to make the calcium powder but were never provided that information.

43.     After Integrated shut down operations in August 2008, the Board employed the services

of an information technology specialist to search for the proprietary information used to make the

calcium powder, but he was unable to locate it.

44.     There is no evidence that Chinmay, Nilu, Naples, or Acotrix has used any such

information to produce the same powder since the Chatterjees' departure from Integrated.

45.     On July 17, 2007, Mr. Chatterjee resigned as CEO of Integrated.

46.     Mr. Chatterjee formed Acotrix, Inc. in August 2007, after his departure from Integrated.

In September 2007, Acotrix purchased Naples from Miserlis. Chinmay purchased 100% of Naples from

Miserlis for only 14.28% of Acotrix, Inc. The only asset that Acotrix had after the purchase and sale was

Naples.

47.     Chinmay became president of Naples in November 2007.

48.     Chinmay created a business presentation for Naples in late 2008 or early 2009 titled

"Product & Marketing Plan." The Naples "Product and Marketing Plan" touts a product called "Totally

Calcium," which is the same calcium powder product that was previously sold as Cal-Sap.

49.     The "Product and Marketing Plan" states that "Naples manufactures and packages

unique Calcium Supplement Powder using its proprietary composition and packaging technology."

50.     Naples used subcontractors to manufacture Totally Calcium, one of which was

Integrated; the other was a French manufacturer called Jung Bauzler.

51.     After Chinmay left Integrated in July 2007, Naples never purchased the calcium powder

from Integrated again.

52.     After Chinmay's resignation, Nilu continued to work as an employee for Integrated until

the company closed its doors and laid off all of its employees on August 22, 2008.

53.     Quickbooks documents were found on Nilu's Integrated computer after Integrated shut

down operations, and these documents showed that she was assisting with the accounting for Naples

and Acotrix, Inc. while she was an officer of Integrated.

54.     Emails on an external hard drive assigned to Nilu by Integrated show that she was

coordinating shipments of Cal-Sap from the packaging company in India, Omni Pharma Consulting, to

the Naples address in Burlington, Massachusetts while she was an officer of Integrated. It was at this

time during August 2008 that Integrated and its officers actually knew that both Chinmay and Nilu were

working for Naples and breaching their fiduciary duties to Integrated.

55.     Nilu continued nominally as a director of Integrated through her resignation on or

around December 8, 2008, but she did not participate in any meetings of the Board or take further

actions in her role as a director following the closing of the facility in August 2008.

56.     Mrs. Chatterjee was not apprised of the decision to shut the plant prior to being laid off,

and she was excluded from Board discussions and key information during the last year of her

employment.

57.     Acotrix is a corporate entity organized under the laws of the state of Wyoming. Acotrix

was not created until after Chinmay left Integrated. Acotrix has never manufactured, distributed, or

attempted to distribute any calcium products.

58.      At the time of their resignations from Integrated, it is unclear whether or not Chinmay

and Nilu had accrued unused vacation time because the existence of an actual vacation policy was not

proven at trial. Although there was some loose arrangement for officers to take vacation days, the

recording, accrual, and eligibility of such time was not shown to be an actual policy, but rather an *ad

hoc*, informal practice utilizing basically the "honor system." Integrated refused to pay Chinmay and Nilu

any alleged unused vacation time after their resignations because it deemed them to have been disloyal

and to have breached their fiduciary duties to Integrated. However, no actual vacation policy existed at

Integrated.

59.      Nilu's salary was $65,615 in 2005, $36,000 in 2006, $36,000 in 2007, and $36,000 in

2008. During the period 2005 through 2008, Nilu did not provide any value to Integrated.

60.      Chinmay's salary during these years was $71,446, $41,461 and $53,308 for the years

2005, 2006, and 2007 respectively, which totals $166,215. During the period 2005 through 2007,

Chinmay did not provide any value to Integrated.

The following (in paragraphs 61 through 74) constitute the Superior Court's relevant rulings of

law.  I include them among the facts for two reasons.  First, they include further Superior Court findings

of fact which, as such, are among the facts to which the parties have stipulated for purposes of this

adversary proceeding. Second, the rulings show how the actions of the Chatterjees, as set forth in the

stipulated facts, resulted in the judgment debts at issue here.  I reproduce these Superior Court rulings

of law essentially verbatim.

61.       Under Massachusetts law, officers and directors owe a fiduciary duty to protect the

interests of the corporation they serve. *Cecconi v. Cecco, Inc.*, 739 F.Supp. 41, 45 (D. Mass. 1990). Senior

executives are considered to be corporate fiduciaries and owe their company a duty of loyalty. *Chelsea*

*Industries, v. Gaffney*, 389 Mass. 1, 11-12 (1983). Corporate fiduciaries are required to be loyal to the

corporation and to refrain from promoting their own interests in a manner injurious to the corporation.

*Seder v. Gibbs*, 333 Mass. 445, 453 (1956). J*ohnson v. Witkowski*, 30 Mass.App.Ct. 697, 705 (1991).

62.      Chinmay, as an officer and director, employee, investor, and second largest shareholder

of integrated, owed the company a fiduciary duty and duty of loyalty.

63.      Chinmay breached his fiduciary duty of loyalty by collaborating with Miserlis to establish

Naples for the purpose of profiting from and capturing the brand name value to Integrated's new

product calcium powder. Chinmay had a personal financial interest in Naples at all relevant times. This is

demonstrated by the fact that Chinmay was able to purchase Naples for no value in return from Miserlis within a month of departing Integrated, and Chinmay's admitted transfers of money from Integrated to Naples to help get Naples started. Chinmay essentially failed to give his undivided attention, work, and brain power to Integrated, which ultimately resulted in the failure of Integrated to bring a product of its own to market.

64.     Chinmay was untruthful when he told the Board that he attended the Market Basket as the CEO of Integrated. He attended the meeting alone, and went as a representative of Naples.

65.     Chinmay refused to retain other marketing and distribution companies for Cal-Sap because he was personally interested in the success of Naples.

66.     Under the doctrine of equitable forfeiture, recognized in Massachusetts, an employee violating a fiduciary duty to an employer can be required to forfeit compensation owed by or already received from the employer. *Boston Children's Heart Foundation, Inc. v. Nadal-Ginard*, 73 F.3d 429, 435 (1st Cir. 1996). However, this remedy, also available [sic] even absent a showing of actual injury to the employer. The doctrine has been limited in Massachusetts cases only to that portion of compensation which exceeded the worth of the employee's services. Here, Chinmay and Nilu conferred no benefit upon Integrated. As their loyalties were completely divided, that disconnect caused Integrated's plan to market and sell Cal-Sap or any other product to fail. Integrated has incurred damages by paying Chinmay a salary while he was advancing Naples' interest to Integrated's detriment during the years 2005, 2006, and 2007. Chinmay's salary during these years was $71,446, $41,461 and $53,308 for the years 2005, 2006, and 2007 respectively, which totals $166,215. This entire amount shall be repaid to Integrated as an equitable forfeiture.

67.     Integrated incurred damages in the amount of approximately $200,000 due to a transfer of money to Naples in the middle of 2005 for "marketing" services.

68.      Integrated also incurred damage resulting from Chinmay's refusal to retain experienced

marketing and distributing companies for the product Cal-Sap because he had a self-interest in funneling

this business exclusively to Naples.

69.      Nilu, as an officer, director, employee, and investor of Integrated, owed the company a

fiduciary duty and duty of loyalty.

70.      Nilu breached her fiduciary duty to Integrated by working on behalf of Naples while she

was an officer of Integrated. Nilu coordinated shipments of Cal-Sap to Naples from its packaging

contractor in India while she was an officer of Integrated. Nilu also performed accounting work on her

Integrated-assigned computer for Naples and Acotrix while she was an officer of Integrated.

71.      Nilu stopped performing her required functions at Integrated, including ensuring the

recertification of the calcium powder.

72.      Integrated has incurred damages by paying Nilu a salary while she was advancing

Naples' interest to Integrated's detriment during the years 2005 - 2008. Nilu's salary was $65,615 in

2005, $36,000 in 2006, $36,000 in 2007, and $36,000 in 2008. As the second highest ranking officer at

Integrated, Nilu breached her fiduciary duty to Integrated in 2005 when she allowed Integrated to

transfer $200,000 to Naples. Nilu also failed to recertify the calcium powder for Integrated in 2006. The

Naples accounting ledger shows that her entries began there in August 2007. The full amount of her

salary shall be repaid to Integrated as an equitable forfeiture.

73.      Integrated incurred damages as a result of Nilu's failing to fulfill her obligations as a high

ranking officer at Integrated during the time she had begun to perform work for Naples. In particular,

Nilu failed to recertify Integrated's calcium powder, which delayed the introduction of the bottled water

product.

74.     Integrated failed to produce sufficient evidence on the issue of lost profits for the Court to determine an amount of money that the company would have made but for the Chatterjees' breach of fiduciary duties.

75.     On the basis of the above findings of fact and rulings of law, the Superior Court directed: (i) "judgment shall enter in favor of the plaintiff Integrated and against the defendant Chinmay Chatterjee as to Count I (Breach of Fiduciary Duty) for a total of $266,215 (Two Hundred Sixty Six Thousand Two Hundred Fifteen Dollars) plus interest and costs. The plaintiff Integrated failed to prove all other Counts against defendant [Chinmay]"; and (ii) "Judgment shall enter in favor of the plaintiff Integrated and against Nilu Chatterjee as to Count V (Breach of Fiduciary Duty) for a total of $273,6!5 (Two Hundred Seventy Three Thousand Six Hundred Fifteen Dollars) plus interest and costs. The plaintiff Integrated failed to prove all other Counts against defendant [Nilu]."

76.     On July 3, 2015, the Superior Court entered judgment against Chinmay and Nilu as so directed.

77.     Chinmay and Nilu appealed from the judgment to the Massachusetts Appeals Court. The Appeals Court determined (in relevant part) (i) that it was not error for the Superior Court to have determined that the breach of fiduciary duty counts against each of the Chatterjees were not time barred and (ii) that the damages awarded against Chinmay and Nilu were supported by the record. Regarding the damages, the Appeals Court stated:

> Nor was there error in the ultimate damage award against the Chatterjees. The judge found that both Chatterjees breached their fiduciary duties to Integrated starting in 2005, and that neither conferred any benefit on Integrated from 2005 through 2008 because their loyalties were divided. The judge found that Integrated paid salaries to Chinmay totaling $166,215 from 2005 through 2007, and to Nilu totaling $173,615 from 2005 through 2008, and properly could order the Chatterjees to forfeit these amounts. See *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1, 12-13 (1983). The judge further found that Nilu breached her fiduciary duty to Integrated when she allowed the company to transfer $200,000 to Naples in 2005, a transfer the judge found to have been made at Chinmay's direction. The judge assigned one-half of that amount to each

of the Chatterjees because Naples did not provide the marketing services for which it was paid, see *One to One Interactive, LLC v. Landrith*, 76 Mass. App. Ct. 142, 148 (2010), (noting that "damages recoverable for breach of fiduciary duty is the loss of those advantages but for the defendants' breach or interference that [the plaintiff] would have been able to attain or enjoy"), and awarded Integrated damages against Chinmay in the amount of $266,215 plus interest and costs, and against Nilu in the amount of $273,615 plus interest and costs. The damages are supported by the record.

78. The Appeals Court accordingly affirmed the judgment as against both Chinmay and Nilu.

**JURISDICTION**

The matter before the court is a proceeding under 11 U.S.C. § 523(a) to determine the dischargeability of certain judgment debt. It arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b).  By standing order of reference, the District Court has referred the matter to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (b)(2)(I) (core proceedings include determinations of the dischargeability of particular debts). The bankruptcy court accordingly has authority to enter final judgment on the complaint.

**DISCUSSION**

The complaint states three counts against each defendant, one under each of three subsections of § 523(a), and each count seeks to except from discharge both components of each defendant's judgment debt:  forfeited salary, and liability for the $200,000 transfer to Naples. For each of the three subsections at issue, (a)(2)(A), (a)(4), and (a)(6), the burden of proof is on the plaintiff creditor, and the standard is a preponderance of the evidence.  *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (the claimant bears the burden of proving that its claim falls within an enumerated exception from discharge); *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 659, 112 L. Ed. 2d 755 (1991) (the standard of proof for discharge exceptions is a preponderance of the evidence).

**Counts I and II:  False Pretenses, False Representations, or Actual Fraud under § 523(a)(2)(A)**

In Count I (against Chinmay) and Count II (against Nilu), Integrated seeks a determination that

both components of the defendants' judgment debts are excepted from discharge by § 523(a)(2)(A).

Section 523(a)(2)(A) states:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of
> this title does not discharge an individual debtor from any debt--
>> (2) for money, property, services, or an extension, renewal, or
>> refinancing of credit, to the extent obtained by—
>>> (A) false pretenses, a false representation, or actual
>>> fraud, other than a statement respecting the debtor's or
>>> an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).  Counts I and II, being based on allegations of false pretenses, false

representations, and fraud, sound in fraud and, as such, needed to be pled with particularity. Fed. R. Civ.

P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting

fraud or mistake."), made applicable by Fed. R. Bankr. P. 7009. It was incumbent on Integrated to specify

the particular representations or acts that constitute each instance of false pretense, false

representation, or fraud that forms the basis of these counts.  In its complaint, Integrated failed to do

so. Rather, in Counts I and II, Integrated simply referred generally to "the actions described

hereinabove," without specifying which of the multitude of actions described above constitute the

instances of false pretense, false representation, or fraud on which these counts are predicated. Nor

was this deficiency rectified at any time before trial. In view of this deficiency in pleading, the defendant

Debtors were not afforded a fair opportunity to defend as to these instances of alleged fraud at trial.

Accordingly, "false pretenses, false representations and actual fraud" under § 523(a)(2)(A) is deemed

effectively forfeited as a basis for a determination of nondischargeability.

**Counts III and IV:  Fraud or Defalcation while Acting in a Fiduciary Capacity**

In Count III (against Chinmay) and Count IV (against Nilu) Integrated seeks a determination that

both components of the defendants' judgment debts are excepted from discharge by § 523(a)(4) as

debts for fraud or defalcation while acting in a fiduciary capacity.[6]

I begin with the allegations of defalcation while acting in a fiduciary capacity.  In relevant part, §

523(a)(4) excepts from discharge any debt for "defalcation while acting in a fiduciary capacity." 11 U.S.C.

§ 523(a)(4). It requires proof of two things: that the debtor have acted as the fiduciary in a fiduciary

relationship; and that his or her conduct in that capacity, the conduct that gave rise to the debt or

liability in question, have constituted a defalcation. *In re Ackerman*, 587 B.R. 750, 785 (Bankr. D. Mass.

2018) and cases cited.

The first matter to determine is whether the defendants were, in the conduct that gave rise to

the judgment debt at issue, acting in a fiduciary capacity, as the fiduciary in a fiduciary relationship.  On

Integrated's motion for summary judgment, the Court ruled for purposes of this adversary proceeding

that the Superior Court's judgment established, by issue preclusion, (i) that under Massachusetts law,

each defendant was, by virtue of his or her position as an officer or director of Integrated, a fiduciary of

Integrated, which is a corporation, and (ii) that each defendant committed the acts on which the

judgment against him or her was predicated as a fiduciary of Integrated.  Also on summary judgment,

the Court further ruled (iii) that the fiduciary relationship of an officer or director of a corporation to

that corporation under Massachusetts law makes him or her a fiduciary for purposes of § 523(a)(4),[7] and

---

[6] In the complaint, Integrated seeks to except from discharge the forfeited wages component of the damages
solely for fraud while acting in a fiduciary capacity, not also for defalcation while acting in a fiduciary capacity.
However, at least as early as the motion for summary judgment, Integrated made clear that it was seeking to
except the entire judgment debt on two alternative bases in § 523(a)(4): fraud while acting in a fiduciary capacity,
and, in the alternative, defalcation while acting in a fiduciary capacity.  At the trial, Integrated reiterated that
defalcation was one of the bases on which it was proceeding, and the Debtors voiced no objection to this.  I
therefore understand the matter to have been submitted for adjudication, as to the entirety of the judgment debt,
on both of these alternative grounds for exception from discharge.

[7] *See Bakis v. Snyder (In Re Snyder)*, 101 B.R. 822, 835 (Bankr. D. Mass. 1989), *aff'd in relevant part and rev'd in part
on other grounds sub nom. Snyder v. Bornstein*, 923 F.2d 840 (1st Cir.1990), cert. denied, 500 U.S. 923, 111 S.Ct.

(iv) on the basis of the Superior Court's findings and rulings, it follows as a matter of federal law that the actions of the defendants on which the state court judgment was predicated were actions undertaken by each defendant in "a fiduciary capacity" within the meaning of § 523(a)(4). The requirements of fiduciary capacity are thus established against both defendants and as to both parts of the judgment against each.

The second matter to determine is whether the conduct of each defendant that gave rise to the debt or liability in question constituted a "defalcation" within the meaning of § 523(a)(4).  Defalcation in § 523(a)(4) requires a breach of fiduciary duty. *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17–18 (1st Cir. 2002); *In re Ackerman*, 587 B.R. at 786.  In *Baylis*, the First Circuit explained that "a defalcation may be presumed from a breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest." *In re Baylis*, 313 F.3d at 20. In ruling on the motion for summary judgment, the Court found for purposes of this adversary proceeding that the Superior Court judgment established preclusively that each of the acts on which the judgment was predicated constituted a breach by the defendant in question of a fiduciary duty, specifically of the duty of loyalty that the defendant owed to Integrated. The judgment, against both defendants and in each part, was based entirely on findings of breach of fiduciary duty.

However, in order to constitute a defalcation within the meaning of § 523(a)(4), a breach of fiduciary duty must involve something more.  A breach of fiduciary duty will constitute a defalcation within the meaning of § 523(a)(4) only when it satisfies certain requirements regarding intent, scienter, risk, or degree of fault. As the Court recently explained:

---

2030, 114 L.Ed.2d 115 (1991) (the fiduciary duties of corporate directors under Massachusetts law satisfy the requirements of section 523(a)(4) of the Bankruptcy Code); *M–R Sullivan Manufacturing Company v. Sullivan (In re Sullivan)*, 217 B.R. 670, 676 (Bankr. D. Mass. 1998) and cases cited (the fiduciary duties of corporate officers and directors under Arizona law satisfy the element of fiduciary relationship required to be proven under § 523(a)(4)); *Reiss v. McQuillan (In re McQuillin)*, 509 B.R. 773, 788 (Bankr. D. Mass. 2014) (fiduciary relationship of officers and directors to their corporation exists in Massachusetts).

Notwithstanding defalcation's broad dictionary meaning, not every default, however innocent, will suffice. A defalcation must involve either (i) moral turpitude, bad faith, or other immoral conduct, or (ii) in lieu of these, an intentional wrong, which includes not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent, such as where the fiduciary consciously disregards, or is willfully blind to, a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74, 133 S.Ct. 1754, 1759–60, 185 L.Ed.2d 922 (2013). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id*. at 1760. In all of these possible ways that *Bullard* [*sic*, should be *Bullock*] may be satisfied—conduct involving "moral turpitude" or "bad faith," "other immoral conduct," an "intentional wrong" involving conduct "that the fiduciary knows is improper," and conscious disregard or willful blindness to a substantial and unjustifiable risk that the conduct will turn out to violate a fiduciary duty—there is a requirement of scienter in the sense of appreciation by the fiduciary of the wrongfulness or his or her conduct, "a culpable state of mind." The Supreme Court was clear on the point: "We hold that [defalcation] includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id*. at 1757.

*In re Ackerman*, 587 B.R. at 786.

At the summary judgment stage, I determined that the Superior Court judgment had not

*preclusively* established what *Bullock* requires. The Court must therefore now determine whether the

stipulated facts support findings, as to each defendant and each component of the judgment debt, that

*Bullock* is satisfied.  The necessary state of mind, rarely provable by direct evidence, may be determined

from the totality of the circumstances, including inferences from circumstantial facts. *Palmacci v.*

*Umpierrez*, 121 F.3d 781, 790 (1st Cir. 1997), citing *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760,

764 (1st Cir. 1994) ("circumstantial evidence may be sufficiently potent to establish fraudulent intent

beyond hope of contradiction"); *Putnam Resources v. Pateman*, 958 F.2d 448, 459 (1st Cir. 1992) ("It is

black letter law that fraud may be established by inference from circumstantial facts.").

I find that, as to each defendant and both components of each's judgment debt, *Bullock* is satisfied. The Chatterjees conduct was objectively wrongful. They were channelling business, opportunities, profits, payments, and their own labors and efforts away from Integrated to Naples, a competing enterprise, all the while drawing a salary from Integrated. This was theft, plain and simple. It was not accidental but knowing and intentional—at all times the Chatterjees fully appreciated their obligations to Integrated, that their efforts on behalf of Naples were inappropriate. They were educated business people, not unable to see their conduct for what it was. The defendants' culpable states of mind are further betrayed by their efforts to keep their conflicts of interest hidden from Integrated's Board and by the fact that neither was forthcoming with the Board about his or her work for and investment in Naples. Accordingly, the Court may and does infer from the stipulated facts that the Chatterjees appreciated the wrongfulness of the conduct on which their judgment debts are predicated.

I conclude that the judgment debts of the Chatterjees to the Integrated are, in their entirety, debts for defalcation while acting in a fiduciary capacity.

Under § 523(a)(4), Integrated also seeks a determination that the same judgment debts are excepted from discharge as debts for *fraud* while acting in a fiduciary capacity.  Insofar as Count III and IV are based on allegations of fraud while acting in a fiduciary capacity, they, too, sound in fraud and, for that reason, needed to be pled with particularity. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."), made applicable by Fed. R. Bankr. P. 7009. It was incumbent on Integrated to specify the particular representations or acts that constitute each instance of the fraud that forms the basis of these counts. In its complaint, Integrated failed to do so. Rather, in Counts III and IV, Integrated simply referred wholesale to "the actions described hereinabove," without specifying which of the multitude of actions described above constitute the instance or instances of fraud on which these counts are predicated. Nor was this deficiency rectified at any time before trial. In view of this deficiency in pleading, the defendants were

not afforded a fair opportunity to defend as to these instances of alleged fraud at trial. Accordingly,

"fraud while acting in a fiduciary capacity" is deemed effectively forfeited as a basis for a determination

of nondischargeability.

### Counts V and VI: Willful and Malicious Injury, § 523(a)(6)

In Count V (against Chinmay) and Count VI (against Nilu) Integrated seeks a determination that

both components of the defendants' judgment debts are excepted from discharge by § 523(a)(6) as

debts for willful and malicious injury to Integrated.  Subsection 523(a)(6) excepts from discharge any

debt "for willful and malicious injury by the debtor to another entity or to the property of another

entity." 11 U.S.C. § 523(a)(6). It requires injury to another "entity," a defined term that includes

corporation, see 11 U.S.C. § 101(15) and (41) (in Title 11, "'entity' includes ... person" and "'person'

includes . . . corporation"), or to the property of another entity. In addition, the injury needs to have

been both willful and malicious. "Willfulness" requires a showing of intent to injure or at least of intent

to do an act which the debtor is substantially certain will lead to the injury in question. *Kawaauhau v.*

*Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "Debts arising from recklessly or negligently

inflicted injuries do not fall within the compass of § 523(a)(6)." *Id*., 523 U.S. at 64, 118 S.Ct. at 978.

"Malicious" requires the injury to have been "wrongful," "without just cause or excuse," and

"committed in conscious disregard of one's duties." *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853,

859 (1st Cir. 1997). Malice thus has both objective and subjective elements: the injury must have been

objectively wrongful or lacking in just cause or excuse; and the debtor must have inflicted the injury in

"conscious disregard" of his or her duties, meaning that the debtor has to have been aware that the act

was wrongful or lacking in just cause or excuse. *Whittaker v. Whittaker (In re Whittaker)*, 564 B.R. 115,

148–49 (Bankr. D. Mass. 2017), and cases cited.

I find that the injuries for which the judgment was awarded are injuries to an entity within the

meaning of this section.  Integrated, a corporation, is as such an entity.  The forfeited salary portion of

each Debtor's judgment debt arose from that fact that each of the Chatterjees received a salary for ostensibly serving Integrated when, in fact, during the years in question, each was serving the interests of Naples and provided service of no value at all to Integrated.  The second part of each Debtor's judgment debt, for each's one-half share of the responsibility for a $200,000 transfer to Naples, was for the injury suffered by Integrated by virtue of that transfer. The parties stipulated (at Facts ¶ 67) that Integrated was damaged by this transfer.

Regarding the injury for which the forfeited salary was awarded as damages, I find as to both Chinmay and Nilu that the injury was both willful and malicious. It was willful on the part of each defendant because the injury was inflicted with intent to draw the salary and with knowledge and substantial certainty that, by drawing a salary from Integrated under the pretense of working as officers of Integrated but in fact working for its competitor, Naples, and providing service of no value to Integrated, they were injuring Integrated.  The same injury was also malicious because, as I found above, the defendants' conduct was wrongful and committed in conscious disregard of their respective duties to Integrated, and each defendant fully appreciated the wrongfulness of his or her conduct. Accordingly, the damages against each defendant for forfeited salary, plus all interest and a proportionate share of the costs, is excepted from discharge by § 523(a)(6).

Regarding the injury for which the balance of the judgment was awarded, the damage to Integrated from a $200,000 transfer from Integrated to Naples, I find that Integrated has failed to establish by a preponderance of the evidence, as to either defendant, that the injury was willful or malicious.  The stipulated facts do not supply sufficient detail about the transfer in issue—its purpose, the role of each defendant in arranging it, the knowledge and intent of each defendant about the transfer, what it was given for, what (if anything) Integrated received in exchange for it—to permit this Court to make findings that the injury was willful or malicious.  Consequently, each defendant's

judgment debt for this transfer, though excepted from discharge under § 523(a)(4) as a debt for

defalcation while acting in a fiduciary capacity, is not also excepted from discharge by § 523(a)(6).

**CONCLUSION**

For the reasons set forth above, judgment shall enter declaring the state court judgment

obligations of the Chatterjees to Integrated, including all interest and costs, to be excepted from

discharge.

Date:  November 28, 2018

Frank J. Bailey
United States Bankruptcy Judge